**Brenda Joyce NORTHRIP,**
**Plaintiff-Appellee,**

v.

**FEDERAL NATIONAL MORTGAGE**
**ASSOCIATION,**
**Defendant-Appellant.**

**Nos. 74–1500, 74–1501.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 12, 1974.

Decided Dec. 11, 1975.

**24**

James N. Candler, Jr., Dickinson, Wright, McKean & Cudlip, W. Gerald Warren, Detroit, Mich., for defendant-appellant cross-appellee.

Piroska E. Soos, Vincent Harrington, Robert J. Hobbs, Peter Neufeld, Boston, Mass., for amicus curiae, National Consumer Law Center, Inc.

George Corsetti, Michigan Legal Services Assistance Program, Wayne State University Law Annex, Paul A. Rosen, Fred S. Findling, Detroit, Mich., for Northrip.

Roger K. Timm, Dykema, Gossett, Spender, Goodnow & Trigg, James W. Draper, Detroit, Mich., for amicus curiae, Mich. Savings & Loan League and Mich. Bankers Assn. and Mich. Mortgage Bankers Assn.

Hoyt P. Spicer, Grosse Pointe, Mich., for appellee.

Before PHILLIPS, Chief Judge, and CELEBREZZE and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal and cross-appeal from a judgment of the district court setting aside a mortgage foreclosure made pursuant to a Michigan statute regulating foreclosure of mortgages by advertisement. The district court held the foreclosure proceeding violative of the due process clause of the Fourteenth Amendment of the United States Constitution and Article I, Section 17 of the Michigan Constitution of 1963. Because we find no significant state involvement in the foreclosure proceedings assailed here, we reverse the judgment of the district court.

Northrip brought this action in Michigan Circuit Court and defendant Federal National Mortgage Association (FNMA) removed it to the U. S. District Court for the Eastern District of Michigan. Jurisdiction was asserted on diversity of citizenship and the existence of a question arising under the Constitution and laws of the United States. 28 U.S.C. §§ 1331 and 1332. Northrip sought injunctive relief to set aside the mortgage foreclosure proceedings taken pursuant to the Michigan statute regulating the foreclosure of mortgages by advertisement, Mich.Comp.Laws Ann. § 600.3201 et seq., on the grounds that the procedure deprived her of property without notice and a prior hearing as required by the Fourteenth Amendment.

On July 28, 1970, Northrip signed a mortgage note and mortgage acknowledging a debt in the principal amount of $11,000 owed to Auer Mortgage Company. The funds acquired by Northrip in the transaction were paid to a home repair company for work performed on Northrip's home. Auer later assigned the mortgage to FNMA.

The parties stipulated that Northrip made her last payment on the mortgage on April 6, 1972, because of her dissatisfaction with the home repairs. FNMA began foreclosure proceedings shortly

after the default, and, on October 19, 1972, purchased the property at a sheriff's sale for $11,476.68, the accelerated balance due on the mortgage note. Six months later, the statutory period for redemption expired and appellant's title to the property became final.

Chapter 32 of the Revised Judicature Act of the Compiled Laws of Michigan sets forth the requirements necessary to foreclose a real estate mortgage by advertisement: the mortgage must contain a power of sale; a default must have occurred in a condition of the mortgage by which the power to sell becomes operative; no suit or proceeding to recover the debt secured by the mortgage can have been instituted and remained pending; and the mortgage itself and its assignments must have been recorded. A notice that the mortgage will be foreclosed by sale must be printed in a newspaper published in the county where the property is located for at least four successive weeks at least once in each week. Within 15 days after the first publication, a true copy of the notice must be posted in a conspicuous place on the premises. The notice must specify the mortgage, the mortgagee, the assignees, the date of execution and recording of the mortgage, the amount claimed to be due at the date of notice, a description of the property, the date, time, and place of the sale and the length of the redemption period. The mortgagee may appoint a person to conduct the sale or the sheriff of a county may conduct it. A deed by the officer or person conducting the sale must be prepared and recorded. The mortgagor or persons claiming under him have six months after the sale within which to redeem residential property not exceeding four (housing) units if less than one-third of the debt has been paid, and one year for such redemption if more than one-third

of the debt has been paid.[1] The record indicates that FNMA foreclosed in strict compliance with the requirements of the statute.

The district court, in its opinion reported at 372 F.Supp. 594 (1974), correctly observed that a predicate to finding a due process violation is a finding of state action. The district court considered several theories advanced by Northrip upon which a finding of state action might be based and expressly rejected all but one. The court held that the involvement of the sheriff and register of deeds in the foreclosure proceedings did not constitute state action; that the statute authorizing mortgage foreclosure by advertisement did not authorize a private party to perform a government function and therefore did not constitute state action; and that the statutory scheme regulating mortgage foreclosure did not so pervasively govern FNMA's conduct that private action became state action. The court, however, accepted plaintiff's theory "that state action exists because the statute encourages mortgagees to seek foreclosure by advertisement, rather than by judicial process," relying on *Reitman v. Mulkey*, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), and *Bond v. Dentzer*, 362 F.Supp. 1373 (N.D.N.Y.1973), *rev'd*, 494 F.2d 302 (2d Cir. 1974). Proceeding then to the question whether the foreclosure procedures followed by FNMA complied with the requirements of due process, the district court determined that they did not because Northrip was not afforded a hearing prior to foreclosure.

Appellant FNMA challenges the district court's determination that state action exists and cross-appellant Northrip contends that state action is present, not only under the theory accepted by the district court, but also under the other

---

1. Michigan also has a statute governing foreclosure by judicial proceeding in an equitable action brought in circuit court. Mich.Comp. Laws Ann. § 600.3101 *et seq.* As one commentator has observed and the district court confirmed, this proceeding is infrequently used because it is a longer and more expensive process. 372 F.Supp. at 597, Van Allsburg, *Property Abandonment in Detroit*, 20 Wayne L.Rev. 845, 867 (1974). Judicial foreclosure is employed principally when a deficiency decree is sought. Mich.Comp.Laws Ann. § 600.3150.

theories it asserted. Amicus National Consumer Law Center contends that FNMA is an instrumentality of the federal government and that its actions are those of the state and are subject to the due process requirements of the Fifth Amendment.

■■■ We consider first the conclusion of the district court that the existence of the statute regulating foreclosure of mortgages by advertisement constitutes state encouragement of this method of foreclosure and is therefore state action for the purposes of the Fourteenth Amendment. In *Reitman, supra,* the Supreme Court upheld the California Supreme Court's holding invalidating an initiative amendment to the state constitution that had the effect of overturning state statutes prohibiting racial discrimination in disposing of real property. The amendment not only overturned the statutes but created a constitutional right to discriminate on the basis of race. The United States Supreme Court held that this constituted state action that encouraged racial discrimination. Justice White, speaking for the Court, observed:

> Private discriminations in housing were now not only free from [the regulatory statutes] but they also enjoyed a far different status than was true before the passage of those statutes. The right to discriminate, including the right to discriminate on racial grounds, was now embodied in the

State's basic charter, immune from legislative, executive, or judicial regulation at any level of the state government. Those practicing racial discrimination need no longer rely solely on their personal choice. They could now invoke express constitutional authority, free from censure or interference of any kind from official sources. 387 U.S. at 377, 87 S.Ct. at 1632.

This case differs materially from *Reitman.* Judge Peck, writing for this court in *Turner v. Impala Motors,* 503 F.2d 607 (6th Cir. 1974), said that *Reitman* "deal[t] with a state attempt to accomplish indirectly what it was prohibited from doing directly. We cannot ignore the fact that the context of onerous racial discrimination in which the case was set demanded special scrutiny." 503 F.2d at 611. In *Turner* and in *Gary v. Darnell,* 505 F.2d 741 (6th Cir. 1974), we upheld the Tennessee and Kentucky legislatures' implementation of § 9–503 of the Uniform Commercial Code, which authorizes a secured creditor to peacefully repossess collateral.

In this, case, as in *Turner* and *Gary,* we are not concerned with questions of racial discrimination or state use of indirect means to accomplish illegal ends. Like *Turner* and *Gary,* this case concerns a remedy privately created by contract.[2]

Michigan recognizes that the power of sale is an incident of the private right to

---

2. Judge Tamm, writing for the court in *Bryant v. Jefferson Federal Savings & Loan Association,* 166 U.S.App.D.C. 178, 509 F.2d 511 (1974) determined that the district judge correctly held that the constitutional question concerning power of sale mortgage foreclosure was insubstantial and therefore did not require the convening of a three-judge district court to consider whether the statute was violative of the Fourteenth Amendment. Judge Tamm made this observation about the district court's opinion in *Northrip*:

> We recognize that one District Court Judge in examining a similar foreclosure statute found state action on an encouragement theory. *See Northrip v. Federal National Mortgage Assoc.,* 372 F.Supp. 594, 597 (E.D.Mich. 1974). We note, however, that the Sixth Circuit has subsequently rejected an encour-

agement argument in a self-help repossession case which we find indistinguishable. *See Turner v. Impala Motors,* 503 F.2d 607 (6th Cir. 1974).

Judge Tamm correctly analyzed our holding in *Turner.* Some of the other decisions upholding § 9–503 are *Gibbs v. Titelman,* 502 F.2d 1107 (3d Cir. 1974), *Shirley v. State National Bank,* 493 F.2d 739 (2d Cir. 1974), *Adams v. Southern California First National Bank,* 492 F.2d 324 (9th Cir. 1973), *cert. denied,* 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed.2d 282 (1974), *Bitchel Optical Laboratories, Inc. v. Marquette National Bank,* 487 F.2d 906 (8th Cir. 1973).

'In *Global Industries v. Harris,* 376 F.Supp. 1379 (N.D.Ga.1974), the court upheld a power of sale foreclosure statute similar to the one at issue here.

contract. *Equitable Trust Co. v. Barlum Realty Co.*, 294 Mich. 167, 292 N.W. 691 (1940). A power of sale remedy in a mortgage was recognized by Michigan courts as a part of common law even before the first statute dealing with the subject was enacted. *Hoffman v. Harrington*, 33 Mich. 392 (1876). In fact, the statute permitting foreclosure upon advertisement was enacted

> to enlarge and not to cut down the rights of mortgagors. Before such statutes were passed, sales made under a power of sale contained in a mortgage were governed by the same rules applicable to sales under any other power, and courts in the absence of statutes have never applied to such powers in any such technical rules as would impair the security of purchasers. The power is part of the contract, and should be construed on principles applicable to contracts, and not as a hostile process.

*Reading v. Waterman*, 46 Mich. 107, 110, 8 N.W. 691, 692 (1881).

Therefore, it is clear that the statute under attack here did not create the power of sale foreclosure. Instead, the state, by enacting this statute, acted to regulate and standardize a recognized practice.[3] If anything, the statute made foreclosure more difficult for the mortgagee because he was required to comply with its provisions. *See Barrera v. Security Building & Investment Corp.*, 519 F.2d 1166 (5th Cir. 1975), *Bryant v. Jefferson Federal Savings and Loan Association*, 166 U.S.App.D.C. 178, 509 F.2d 511, 515 (1974), and *Bond v. Dentzer*, 494 F.2d 302, 308–09 (2d Cir. 1974).

From a comparison of the operation of this Michigan statute and the self-help repossession statute involved in *Turner*, we are convinced that there is no substantial difference in the amount of state involvement through encouragement.[4] What Judge Peck said in *Turner* applies as well here:

**3.** The English courts have recognized that a power of sale is a "necessary incident to a mortgage . . . . [A] power to mortgage includes a power to give to a mortgagee all such remedies as are proper to be given to him, so as to mortgage the estate on the best terms, and one of these remedies is a power of sale." *Re Chawner* (1869) L.R. 8 Eq. (English) 569, 72 A.L.R. 158, 159 (1937).

Judge Wisdom explained the American experience with non-judicial foreclosure in *Barrera v. Security Building & Investment Corp.*, 519 F.2d 1166 (5th Cir. 1975):

> Non-judicial foreclosure under a power of sale can certainly be characterized as a traditional remedy. Although it is not entirely clear when powers of sale first came into use in this country, they were sufficiently commonplace in 1774 to prompt New York to enact a statute to regulate their use. G. E. Osborne, Handbook on the Law of Mortgages, 726 (2d ed. 1970). In 1828 a New York court described the power of sale as "as ancient as the formation of the English government in this state." *Slee v. President, et al. Manhattan Co.*, N.Y.1828, 1 Paige 48, cited in Osborne at 729, n. 12. In Texas, non-judicial foreclosure under a power of sale in a deed of trust has been used and recognized for over one hundred years. *See,* for example, *Hipp v. Hutchett*, Tex.1849, 4 Tex. 20, 25. Courts in the United States consistently recognized these powers of sale

as valid and enforceable. Justice Field, speaking for the Supreme Court, held, in 1895:
> "There is nothing in the law of mortgages, nor in the law that covers what are sometime designated as trust deeds in the nature of mortgages, which prevents the conferring by the grantor or mortgagor in such instrument of the power to sell the premises described therein upon default in payment of the debt secured by it, and, if the sale is conducted in accordance with the terms of the power, the title to the premises granted by way of security passes to the purchaser upon its consummation by a conveyance." *Bell Silver & Copper Mining Co. v. First National Bank*, 1895, 156 U.S. 470, 477, 15 S.Ct. 440, 443, 39 L.Ed. 497, 501. Somewhat later the Court noted that "[t]he validity of such a contractual power of sale is unquestionable." *Scott v. Paisley*, 1926, 271 U.S. 632, 635, 46 S.Ct. 591, 592, 70 L.Ed. 1123, 1125. Professor Durfee could, in fact, find only a single instance of judicial nullification of a power of sale. Durfee, Cases Mortgages 355 n. 23, cited in Osborne at 726 n. 11.
519 F.2d at 1172–73.

**4.** The other case relied upon by the district court as authority for finding state action by encouragement has been reversed by the Second Circuit. *Bond v. Dentzer*, 494 F.2d 302 (2d Cir. 1974). The *Bond* case involved a constitutional attack on New York's wage assign-

It is clear that in this case the state did not exert any control or compulsion over the creditor's decision to repossess. The private activity was not commanded by the simply permissive statute. While mere existence of the statute might seem to suggest encouragement, we conclude that the effect of the statute is only to reduce a creditor's risk in making repossessions. As a practical matter, a creditor's decision is more likely to be principally influenced by the economics of the situation than by the presence of a permissive statute.

We fail to see where the creditor has sought to invoke any state machinery to its aid. Rather, the creditor has simply relied upon the terms of its security agreement pursuant to the private right of contract. Compare *Shelley v. Kraemer*, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Assuming that the statute was non-existent, the remedy of self-help repossession could still be utilized based on its common law heritage and the private right to contract. We fail to see how the creditor is attempting to enforce any right in reliance upon a constitutional or statutory provision as in *Reitman* or is even asserting any state-created right. Rather, we see a creditor privately effectuating a right which was created in advance by contract between the parties. At best, the right is one that is merely codified, but not created, in the statute.

503 F.2d at 611–12. (Footnotes omitted.) *See also Federal National Mortgage Ass'n v. Howlett*, 521 S.W.2d 428 (Mo. 1975).

We also reject cross-appellant's arguments that state action exists because of the involvement of a state official in the foreclosure process and because the mortgagee is engaged in a traditional state function. The cross-appellant contends that state action may be found because the sheriff conducted the foreclosure sale pursuant to Mich.Comp. Laws Ann. § 600.3216 and because the register of deeds was involved in transferring the title. *Id.* § 600.3232, 3236.

We observe at the outset that although a deputy sheriff conducted the foreclosure sale in this case, Michigan law permits the parties to agree that another person will conduct the sale. Mich.Comp.Laws Ann. § 600.3216. In fact, in *Watson v. Lynch*, 127 Mich. 365, 86 N.W. 807 (1901), the Michigan Supreme Court held in a case where the sale was advertised to be made by the mortgagee, the sheriff was not authorized to conduct the sale unless so instructed by the mortgagee. *See also Bryan v. Staus Bros. & Co.*, 157 Mich. 49, 53, 121 N.W. 301 (1909).

Appellee cites *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) and *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) as examples of cases where state action was present because state officers acted to deprive persons of property. The garnishment (in *Sniadach*) and replevin (in *Fuentes*) did not depend upon a contractual power granted to the creditor as is the case here. Instead, any person could invoke the aid of the state with no more than a bare assertion that money was owed him. A state officer then directed the

ment statute. The court of appeals, relying on its decision upholding the self-help repossession statute, § 9–503 of the Uniform Commercial Code, *Shirley v. State National Bank*, 493 F.2d 739 (2d Cir. 1974), held that a lender's action in filing the assignments with a borrower's employer was private action since the state was not significantly involved in the challenged conduct.

The State in this case has not deprived the plaintiffs of anything. They have entered into agreements with the defendants in which they have secured funds on the distinct understanding that if there is a default on the loan, the creditor may attach and collect a percentage of the debtor's wages. It was ever thus. A lender who advances money without any security except the fact that his debtor is employed, expects to be able to have access to the security without the necessity of commencing a law suit to establish the debt.

494 F.2d at 307.

debtor's employer to withhold wages (in *Sniadich*) or physically removed personal property from the premises (in *Fuentes*). In this case, the sheriff's presence was only incidental, and not essential, to the employment of a remedy entered into privately by the mortgagee and mortgagor.

With respect to the register of deeds, it appears that he is required to do no more than to record the deed and indicate whether a redemption takes place. As one court has observed: There is "little significance in the fact that a clerk may perform the ministerial act of recording the deed under power evidencing sale or that courts of the State of Georgia may enforce the agreement the parties have made. Were those factors considered determinative, every private agreement between citizens would be imbued with state action." *Global Industries v. Harris*, 376 F.Supp. 1379, 1383 (N.D.Ga.1974). (Footnotes omitted.)

Thus, we do not believe the presence of the sheriff and register of deeds in this procedure constitutes state action under the Fourteenth Amendment. We agree with the district court that: "State action does not necessarily result whenever a state renders any sort of benefit or service to a private entity or seeks to regulate private activity in any degree whatever." 372 F.Supp. at 597 citing *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 173, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972).[5]

▪ Cross-appellant next contends that FNMA should be subjected to constitutional restraints because the state has delegated to it activity which the state would normally undertake itself. Specifically, Northrip asserts that the challenged statute empowers the mort-

gagee to make a unilateral determination of default, to initiate foreclosure proceedings upon that determination, and to cause the property to be sold pursuant to its request. State action has been found in a private party's exercise of powers traditionally and exclusively reserved to the state. *Nixon v. Condon*, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1931) (election); *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (company town); *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966) (municipal park). As we have indicated already, this foreclosure statute does not empower the mortgagee to engage in any traditional state function. The rights exercised by the mortgagee upon the default of the mortgagor are essentially the same ones that existed at common law. The statute merely regulates the power of sale foreclosure; it does not create it. Accordingly, we do not find state action under the theory that FNMA was engaging in a governmental function.

We observe that the Fifth Circuit has recently discussed one of the cases relied on by Northrip and rejected its application to a non-judicial mortgage foreclosure procedure. *Barrera v. Security Building and Investment Corp.*, 519 F.2d 1166 (5th Cir. 1975). In the case relied on by Northrip, *Hall v. Garson*, 430 F.2d 430 (5th Cir. 1970), the court considered a due process challenge to the self-help remedy created by a landlord lien statute. It empowered a landlord to enter premises held by a tenant in default and to restrain the tenant's personal property found on the premises. The court described such a taking as "closely resembl[ing] a seizure and satisfaction of a judgment—a function traditionally per-

---

5. We also agree with the district court's conclusion and find no merit in Northrip's contention that the statutory scheme regulating mortgage foreclosures in Michigan is so pervasive as to constitute state action.

This case is distinguishable from *Turner v. Blackburn*, 389 F.Supp. 1250, 1258 (W.D.N.C. 1975), where a three-judge district court found state action when a mortgage was foreclosed pursuant to a power of sale mortgage foreclosure statute in North Carolina. The court said the procedure was "a streamlined version of a judicial sale, with the clerk exercising by detailed statutory authority many of the supervisory powers inherent in a court of equity." *See also Barrera v. Security Building and Investment Corp.*, 519 F.2d 1166, 1170 n. 5 (5th Cir. 1975).

formed by a sheriff or other state agent." 519 F.2d at 1172, *quoting James v. Pinnix*, 495 F.2d 206, 208 (5th Cir. 1974).

The Fifth Circuit determined that *Hall v. Garson* was not applicable to a challenge of a non-judicial foreclosure statute because "no state statute creates a right in mortgagees to proceed by non-judicial foreclosure; the right is created by contract. Moreover, the action taken by the appellee cannot be described as a function that has been traditionally the exclusive prerogative of the state." 519 F.2d at 1172.

## FEDERAL ACTION

■ On appeal, Amicus National Consumer Law Center contends that state action, or more properly, federal action exists under another theory. Amicus contends that FNMA, a federally chartered corporation created for the purpose of maintaining a secondary market for home mortgages, is a federal instrumentality and that its action in foreclosing upon the mortgage is the action of the federal government and is subject to the due process clause of the Fifth Amendment. FNMA, as it exists today, was created by Congress in the National Housing Act of 1968 as a government sponsored private corporation whose purpose was to provide a secondary market for home mortgages. 12 U.S.C. § 1716. It succeeded what President Johnson termed a "hybrid" corporation by the same name "owned in part by private shareholders, in part by the government, but managed by Government officials." Believing that the secondary market operations were more appropriately placed in the private sector, the President proposed, and Congress passed legislation designed to transfer the secondary market operation of FNMA to completely private ownership. President's Message, *Houses and Cities*. H.R.Doc. No. 261, 90th Cong., 2d Sess. (1968). The common stock is presently traded on the New York Stock Exchange. Pursuant to the 1968 legislation, the Board of Directors of FNMA consists of 15 members. 12 U.S.C. § 1723(b). Of the 15 members, five are appointed annually by the President and the remaining ten are elected by the common shareholders. Among the Presidential appointees, at least one representative is required from each of three affected industries: home building industry, mortgage lending industry, and real estate industry.

The Secretary of Housing and Urban Development is granted two kinds of supervisory powers over FNMA. First, 12 U.S.C. § 1723a(h) provides:

> The Secretary of Housing and Urban Development shall have general regulatory power over the Federal National Mortgage Association and shall make such rules and regulations as shall be necessary and proper to insure that the purposes of this subchapter are accomplished. No stock, obligation, security, or other instrument shall be issued by the corporation without the prior approval of the Secretary. The Secretary may require that a reasonable portion of the corporation's mortgage purchases be related to the national goal of providing adequate housing for low and moderate income families, but with reasonable economic return to the corporation. The Secretary may examine and audit books and financial transactions of the corporation, and he may require the corporation to make such reports on its activities as he deems advisable.

In addition to the broad regulatory powers granted by the statute above, the Secretary has authority to approve the minimum amount of FNMA stock to be held at all times by servicing companies, which, by statute, cannot exceed two percent, and to limit the rate of dividends on common stock. 12 U.S.C. § 1718(c). However, the profits of the corporation are taxed at the regular corporate rates. The Secretary also is authorized to borrow in excess of 15 times the sum of capital, capital surplus, general surplus reserves, and undistributed earnings. 12 U.S.C. § 1719(b). The Secretary of Treasury also has some control

over FNMA in relation to the issuance of debt securities and borrowing from the Treasury. 12 U.S.C. § 1719(b)–(e).

Before the reorganization of FNMA, its employees were government personnel within the Department of Housing and Urban Development, and therefore were covered by civil service requirements and retirement laws. To protect employee benefits that had accumulated, the statute provided for continuation of their participation in the system as long as they remained employees of FNMA. However, all employees hired after 1968 became employees of the corporation and are not subject to the civil service laws. 12 U.S.C. § 1723a(d)(1).[6]

Amicus relies heavily on our decision in *Palmer v. Columbia Gas of Ohio*, 479 F.2d 153, *modified by Turner v. Impala Motors*, 503 F.2d 607 (6th Cir. 1974) as authority for finding state action as a result of the government regulation placed upon FNMA. In that case we upheld a district court's finding of state action when a gas utility company terminated service to customers for nonpayment of bills. We observed in that case that the operations of the utility company were "fully circumscribed by an all-encompassing system of state statutes, city ordinances and the supervision of the state regulatory authority." 479 F.2d at 165. In addition, we determined that the state was significantly involved in the activity of turning off service because a state statute permitted the utility company to enter private homes and disconnect service. Ohio Rev.Code § 4933.12. In addition, another statute permitted the utility company to obtain an *ex parte* warrant directing a constable to accompany an employee to aid him in gaining entry to remove or inspect company equipment in the home. Our conclusion was that the "regulatory activities of the state have insinuated it into a position of interdependence with the company so that it must be recog-

nized as a joint participant with the company . . . ." 479 F.2d at 165.

After oral argument in the present appeal, the Supreme Court handed down its decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). Like the *Palmer* case, the Court in *Jackson* considered the question whether state action existed in a utility termination case. The Supreme Court held that the state was not sufficiently connected with the challenged termination to make the utility company's conduct attributable to the state because "[a]ll of petitioner's arguments taken together show no more than that Metropolitan was a heavily regulated private utility, enjoying at least a partial monopoly in the providing of electrical service within its territory, and that it elected to terminate service to petitioner in a manner which the Pennsylvania Public Utilities Commission found permissible under state law." 419 U.S. at 358, 95 S.Ct. at 457.

Although *Palmer* is distinguishable from *Jackson* because of the existence of state statutes permitting utility companies to enter residences for the purpose of disconnecting service and permitting the company to obtain, by *ex parte* application, a warrant to enter the premises, we understand *Jackson* to have limited *Palmer* to its peculiar facts. When private corporations are endowed by the state with functions or powers of a governmental nature, they become instrumentalities of the state and are subject to its constitutional limitations. That is not this case. Mortgage foreclosures through power of sale agreements are not powers of a governmental nature. As the history of this corporation shows, it was transferred to private control in 1968 because its activities were not thought to be governmental in nature.

There is some, and perhaps even significant, government involvement in, and regulation of, the workings of FNMA.

---

6. For a more detailed analysis of FNMA, its predecessor and its counterpart, Government National Mortgage Association, see Professor Bartke's article, *Fannie Mae and the Secondary Mortgage Market*, 66 *Northwestern Law Review* 1 (1971).

The appointment of one-third of the board of directors by the President, the supervisory control of the Secretary of Housing and Urban Development over the corporation, the government status of some of its employees, and the congressional creation and extensive statutory regulation of the corporation amounts to at least some state involvement in the operation of FNMA's business.

However, *Jackson* indicates that our inquiry concerning state involvement does not terminate with a determination that there is some, or even significant, state involvement. (Dissenting opinion of Marshall, J., suggests the presence of "significant" state involvement in *Jackson*. 419 U.S. at 368, 95 S.Ct. 449). "[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453. The Court pointed out that: "If we were dealing with the exercise by Metropolitan of some power delegated to it by the State which is traditionally associated with sovereignty, such as eminent domain, our case would be quite a different one. But while the Pennsylvania statute imposes an obligation to furnish service on regulated utilities, it imposes no such obligation on the State." 419 U.S. at 352–53, 95 S.Ct. at 454.

Here, as in *Jackson*, there is not a "sufficiently close nexus" between the state and the challenged act of foreclosure. As we have already determined, the power of sale foreclosure is not imbued with state action; it is a privately created contractual remedy analogous to the self-help repossession remedy afforded secured creditors under § 9–503 of the Uniform Commercial Code. The statutes regulating FNMA imposed on it certain obligations but there is no indication that FNMA's activities necessarily should be considered powers traditionally associated with sovereignty, such as eminent domain.

It was the congressional intent to disassociate FNMA from its previous government ownership because it was not appropriate for the government to be involved in the operation of a secondary mortgage market. The House Banking and Currency Committee determined that FNMA's secondary market operation had proven economically sound and capable of being financed solely from private sources. Indeed, the committee expected that "the privately owned corporation, with its improved financing methods, will add significant impetus to the flow of funds in the secondary market and the availability of credit in the home mortgage market." 2 U.S.Cong. & Admin.News '68 at p. 2943.

We believe that FNMA is sufficiently analogous to the public utility described in *Jackson* so that its actions should not be considered those of the state.[7]

However, we do not suggest that our investigation of state involvement would end so abruptly in another case. Judge Friendly has identified several factors to be considered in determining whether

---

7. Amicus National Consumer Law Center has brought to our attention a decision by a three-judge district court that has held FNMA to be a federal instrumentality. *Federal National Mortgage Association v. Lefkowitz*, 390 F.Supp. 1364 (S.D.N.Y.1975). The court held that for the purposes of the Supremacy Clause FNMA was a "federal instrumentality." In arriving at this conclusion, the court discussed neither state action cases nor cases construing the Supremacy Clause as they related to federally organized corporations.

In that case, FNMA contended that it was not required to pay certain fees to the State of New York because payment would interfere with its ability to discharge its congressionally-mandated function. Although conceding that FNMA was a federal instrumentality, the court determined that the New York statute requiring mortgagees to pay mortgagors' interest on escrow funds did not impose such a burden on FNMA's federal function as to violate the Supremacy Clause. Although the court may properly have determined that FNMA was a federal instrumentality under the Supremacy Clause, we are not persuaded to follow the case in a situation involving state action under the Fourteenth or Fifth Amendment.

state action exists. Such a finding "hinges on the weighing of a number of variables, principally the degree of government involvement, the offensiveness of the conduct, and the value of preserving a private sector free from the constitutional requirements applicable to government institutions." *Wahba v. New York University*, 492 F.2d 96, 102 (2d Cir.), *cert. denied*, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).

If the conduct here was more like that complained of in *Palmer*, where the state authorized a procedure empowering utility companies to obtain *ex parte* warrants to enter a home, a more offensive act and one that is generally associated with a power exercised by the sovereign, we would be inclined to find state action. Nor are we here concerned with a case of racial discrimination. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). Here, instead, as in the case of self-help repossession under § 9–503, we are concerned with an age-old creditor remedy. The fact that FNMA has foreclosed this mortgage is no more significant than if the Auer Mortgage Company, the predecessor mortgagee, had initiated foreclosure proceedings.

In this case too there is value in preserving the private sector free from constitutional requirements. Assuming *arguendo* that state action was present here and that due process was not afforded by the mortgage proceedings, Amicus Curiae Michigan Savings and Loan League and Mortgage Bankers Association of Michigan point out that there would be a substantial increase in costs any time a mortgagee instituted foreclosure proceedings. It is Amicus' estimate that the out-of-pocket expenses would increase from the present $200 for a power of sale foreclosure to $1000 for a foreclosure by judicial action. It should be observed too that there is little reason to impose on any mortgagee the requirement of a due process hearing before foreclosing since, as a practical mat-

ter, unless the mortgagor had defaulted on the debt, there would be little reason for instituting foreclosure proceedings.

Since we find neither state nor federal action implicated in FNMA's mortgage foreclosure, we need not reach the due process issue. The Michigan due process provision, Article 1, Section 17 of the Michigan Constitution, like the Fourteenth Amendment due process provision, is applicable only where there is state action. *Grubaugh v. City of St. Johns*, 384 Mich. 165, 170, 180 N.W.2d 778 (1970); *Himes v. City of Flint*, 38 Mich.App. 308, 315, 196 N.W.2d 321 (1972). Northrip does not argue that the Michigan constitutional due process provision requires a different quantum of state involvement for a finding of state action from that required by the Fourteenth Amendment, and we believe that the Michigan courts would not find state action here.

The judgment of the district court is reversed.